Donable, the judges of the United States Court of Appeals for the Fourth Circuit. All right, we'll hear McCoy v. Correctional Officer Endicott et al. and start with Mr. Nessel. Thank you, Your Honor. Thanks for having me. I appreciate it and I hope everybody's having a good morning. This matter revolves around a case before Judge Chambers in the Southern reverse and remand this matter back to district court. And there's two errors, but they're pretty much intertwined, Justices, one of which is the court prematurely granted summary judgment at the lower level and then, again, denying a motion to reconsider that. Now, the facts of this matter are, I'll be extremely brief. I know the court's armed with all the information. Mr. Nessel? Yes, sir. Mr. Nessel, this is Judge King. Do you have a final order here that's appealable? Yes, sir. Seems to me that the state claims are still pending. Well, not in regard to... State law claims. You've got 12 state law claims. Yes, sir. In regard to the federal claims in 1983 action, Your Honor, those are all pending. Or, excuse me, those are all, those are final. The state law claims have been dismissed? Your state law claims have been dismissed? Yes, this case has been dismissed completely. They granted summary judgment on behalf of Mr. You didn't ask for it to be, nobody asked for it to be, all the claims to be dismissed. They asked for the 1983 claim to be dismissed. Right, but the court granted and dismissed this matter. I think they're still, well, I think they're still, the state law claims are still pending and I think you've got a jurisdictional problem, but go ahead. Okay. Well, I'm looking at the conclusion in Judge's August 13th, 2019. Mr. Nessel, he doesn't address any of those state law claims unless you read the qualified immunity part of his opinion as dealing with, the West Virginia version of qualified immunity and somehow and impliedly that, that resolved the state law claims. I think he dealt with Kingsley and then he applied qualified immunity. So I think Judge King's absolutely right. What happened to these state law claims? Well, I thought they were all dismissed according to the order. Where's the order? What page? Your Honor, it begins on page, hold on one moment, please. Okay. The judgment order is October, well, there's two orders. Should be 243 according to what I had. That's right. And then reconsideration is 255. Yes, sir. Well, I think there was a different appendix, Your Honor. It's 354 is the August 13th, 19 order. Then there's 366, which is October 3 and 372, which is the October 16th, 2019 judgment order. Mr. Nessel. You had 12 state law claims, right? I beg your pardon, Judge King? You had, in your complaints, you had 12 state law claims. I did. Eight tort claims and four state constitutional claims, I think. Yes, sir. And the only thing y'all litigated was the 1983 claim. Well, that's right, and that's what this appeal is about, the 1983, which I think is the most salient claim. That's right, but you've got to have a final order to get that reviewed, I think. But anyway. Did the court dismiss the state claims? The court dismissed the case, period. No, I'm asking the state claims. Is there any indication the court disposed of addressed the state claims? By and through qualified immunity, which you had just brought up. But that's not clear. But did the court address qualified immunity on all the state claims? That's the way I read the order, yes, because it completely dismissed the matter. It wasn't raised as to all the claims. I believe it was, Your Honor. It's somewhat ambiguous, isn't it? Well, it seems that way. I mean, Judge King's point, I suppose, is if the motion is made with respect to one count, which is the 1983 count, and the court addresses that motion, and there's no motion made with respect to the state counts, and the court doesn't address the state counts, and then it purports to dismiss the whole case, what's the status? Well, Your Honor, then it's dismissed. It was stricken from the docket up until I filed my notice. No, but that doesn't mean the state claims aren't there, or does it? Maybe they aren't. If Judge Chambers dismissed the whole case and struck this whole matter from the docket, then apparently he dismissed all claims, Your Honors. We'll have to think about that unless you guys want to give me any more advice. We'll ask your colleague when he's up about it, too. Okay. Why don't you go on with your merits? Thanks, Your Honor. Well, anyway. I think generally we look at the substance, not the form, regardless of the label, getting by with the district court opinion. We look to see whether the district court adjudicated all the issues in the case, and if without that, there's no final order. That's in a case called Porter v. Zook, which is a Fourth Circuit case in 2015, 803 Bed 3rd, 694. A mislabeling of the non-final as final doesn't make it final. Well, may I ask you something, Judge King? Well, I don't normally come here to answer questions. Yes, sir. I usually come here to ask them, or I listen to the lawyers and my colleagues. But I'm just observing that you're going to have to get past this Porter v. Zook to make this a final order. Yes, sir. Well, again, I take this as a final order because when Judge Chambers entered it, it was stricken completely from his docket up until I filed the notice of appeal. When I e-filed it, it said this case is closed. However, I had to go through, of course, regular appellate. What if the appellee in this case said that the court's words are a misnomer, that it never addressed the other counts? They were never brought on the table, never disposed of, never considered, and that the court, in dismissing the whole case, overlooked it, and they moved to dismiss the appeal on the basis of subject matter jurisdiction. Well, if the appellee did that, Your Honor, then, I mean, if he argued that, then my response would be the same, is that I'm going on what Judge Chambers did. He dismissed this matter completely. Well, we know, but I'm conceding he did that. The question is, if that was error, what if he misspoke? Well, if he misspoke, then I'd have to go before Judge Chambers again and see exactly what he had meant, sir. I assume. Well, maybe you could dismiss them while they're on appeal. I don't know. Subject matter jurisdiction is something that we always can raise at any time, even after all arguments. Okay, why don't you make any other argument you want? Okay, Your Honor. I'll proceed. Basically, the facts of this matter is that Ms. McCoy was an inmate at Western Regional Jail, which is run by the defendant, West Virginia Regional Jail Authority. On Tuesday, February 13th of 2018, she was in her cell having a diabetic seizure. One officer, Officer Ferguson, proceeded in her cell, and according to my client's sworn deposition testimony, began mocking her. Things transpired. There was an issue between Ms. Ferguson, the CO, and my client, Ms. McCoy, and so she was ordered out of her cell. The video clearly shows, and the video's been provided to the court, the video shows Ms. McCoy being complicit with the order. She put her left hand and her right hand on the wall. Just a minute, just a minute. The prelude there, I don't know if it's relevant, but Ferguson says that she did call for a medical thing, but then she complained about being in that cell or in that pod or whatever and wanted out, and the video shows Ferguson trying to close the corner where he has her up against the wall and she's called for help. Now, I don't know if that makes any difference, but the video clearly shows Ferguson trying to close the cell door while McCoy is pushing the door out to get out, which is consistent with the testimony of Ferguson, a statement of Ferguson. Ferguson's statement, as you know, is in one of those reports. She made a statement, and that's what her statement was. But regardless, she's in the corner, and Ferguson said she's trying to give her some knee to get her to the ground to get her in control. She has her hands up in the corner, and she calls for help. Two guards come in and take her down very quickly, one pulling the legs out, and the other said he used an arm, I don't know what that is, a straight arm method, and took her down to the ground, and of course, in doing so, she hit her head terribly on the concrete, which broke some bones, and that's really, that makes the case really tough. But when you look at the video, it looks like the officers just came in quickly, took her down to the ground to get control of her, and escorted her out of the room. May I? Please, please respond. That's what I saw in the video. Okay, well, Your Honor, there's a dispute between what Officer Ferguson and my client stated. My client stated- No, no, tell me what the video showed to you, and then you can go back to that. But I'd like to get some agreement as to what we're looking at in the video. Well, yes. Okay, I will agree with you on that, Your Honor. Now, okay. Yes, but the point in the issues with Ferguson, her mocking my client in that cell, according to my client's sworn testimony, and Ms. Ferguson, Officer Ferguson wasn't under oath when she gave her written statement. But nevertheless, but I'll go with what the court had asked. When Ms. McCoy was outside, she was out there and she was on the wall. As testified by both Hale and Hindicott, the boots stomping in that empty cell pod, the pod, and the court has seen it, makes a very loud echo. Upon hearing that, my client turns to her left. These two individual officers, what they did was bypass various steps and went straight to deadly force. The deadly force as defined by their employer. Now, just a minute, would you say that using the force necessary to take somebody down, which officer learns when they do any kind of arrest or taking somebody under control, is that deadly force or is it deadly force simply because what happened as a result of the fall was very serious? Well, the definition of deadly force, according to the West Virginia Regional Jail Authority, is that a broken bone or making an organ inoperable. So basically, the broken bones, which my client had, when she hit, and as you've noted, Judge Nehemiah, when Ms. McCoy hit on the floor on the right side, the force was so bad, it not only broke that part of her mandible, but the other side, that's where the significance was. That's the broken bones. And then in regard to loss of an organ, it ruptured her ear. Mr. Nestle, it turns out in this case, and the injuries were severe, but that doesn't determine whether or not the arm bar and the leg sweep constituted in and of itself deadly force. You're looking at the outcome. Let me ask you this, this one plus one policy that you cite, which I think the court can consider, it doesn't set the standard, but it informs as to whether or not the use of force was reasonable. Where was, as I understand it, the officer can take one level beyond in order to maintain control. So where was Ms. McCoy on that continuum? And in response, what did the officers do? I think I know the answer to the second question. Well, the options, Your Honor, and it was testified to by at least one of the officers, the options, as you mentioned, it's officer presence. That's the person being there. Verbal direction, that could have been used. Empty hand control. We're beyond that. I mean, she broke out of her cell. She was engaged in a struggle with a correctional officer in the middle of the pod. You had somebody approaching another inmate. I don't know what she was going to do, but that's a serious security breach. I mean, I think you're intermediate at a minimum, aren't you? No. I think what we are, yes, I think we're intermediate at that point, but I would argue that would be the third one, which is C. They went straight to picking her up and body slamming her, Your Honor, and that's what caused these severe injuries, permanent injuries. Now, I understand what the courts say in Judge Collin, but what I am arguing is that as they testified in their depositions, yes, they could have done something else. Simply put their hands behind her back. They have the zip ties. They could have secured her that way. These are two grown men who work out. They're about, they're around six foot, 240 pounds. My client is about 5'7", about 165 at the time. What they could have done and what they should have done according to their employer, and quite frankly, in their deposition transcripts, what they could have done and should have done, there were two of them. One of them grabbed each arm, placed them behind her back. That's all they should have done. That would have secured her to no end whatsoever. In addition, Officer Ferguson was there. What they did, what they did, Hale and Endicott, was went straight to the most dramatic thing possible, picking her up and body slamming her, crushing her head, suffering a concussion, rupturing an eardrum, and breaking her mandible. They easily could have put her arms behind her back, but they did not. She was against the wall. She was not flailing. Witness statements state the same, and I see my time is up on this. Okay, thank you. Thank you, sir. I'll mute. Mr. Murray? Yes, Judge, please report. My name is Bill Murray, and as you know, I'm here today representing officers Endicott and Hale. We are asking the court to uphold and affirm the lower court's ruling that the force that was used in this incident was objectively reasonable, which is the standard by which this case is judged. The main thing we have in this case, which as Mr. Nessel knows, because he and I have had many cases together, we don't often have the luxury of having video evidence. However, in this case, we do have the video evidence, and the video evidence is clear, and to some extent disputes Mr. Nessel's characterizations of it. But what it shows, and Judge Niemeyer, you were correct, we don't necessarily get into what happened between Ferguson and McCoy prior to the officers entering the room. They were out in the jail. They got a call for officer assistance. When they come through the door, as Judge Cullen has pointed out, they are faced with a hands-on incident with an inmate and an officer in a corner. You have two other inmates that are loose, one of whom has moved very, very closely to them. Now, we don't know whether or not she was going to get involved in any way. We have no way of knowing that, but it really doesn't matter because the perception is to the officers, this is what's going on. They are trained to take control of a situation, and they move in. What they have to do is they have to get control of this inmate who is struggling and in an altercation with another inmate, and that's what they do. From the time they enter that section to the time of the takedown is all of seven seconds. Mr. Nessel would argue, well, they could have done other things. They should have done that, but we don't go back and look with 20-20 hindsight in this instance. As the Kingley v. Hendrickson case pointed out, we take the officers at the very moment that they act. What do they see? What do they perceive? As Judge Niemeyer, the straight-arm bar takedown that you referred to, that is a technique which is used and which is trained where you take the wrist, you pull the arm straight, you put pressure down on the elbow, and you push down, and that forces the person to the floor. That's what they're supposed to do. The fact that, unfortunately, in this case, a severe injury occurred does not make that use of force deadly force. Does it usually occur simultaneously with someone else taking out the legs? How did that come about based on the record, and did that kind of compound the problem? He was grabbing at her legs to try to get a hold of her. He didn't do the sweep that the video shows, as was alleged, but he was trying to grab a hold of her at the same time Mr. Endicott did this arm bar takedown, and she went down. But that's what they're taught to do is get these people on the floor, on their stomach, control the head, so then you can get control of the whole body and the situation. And that's all they did. Is that deadly force? It is not, Your Honor. Why not? Deadly force is defined as force which is likely to cause death or a serious bodily injury. Now, when you're dealing with a jail setting, we're dealing with a place that is constructed primarily of concrete, steel, and cinder blocks. And unfortunately, when people go down, sometimes they get hurt. I've seen lots of them. You'll end up with bruises, possibly cuts or laceration, but it's not likely anytime you take down that you're going to injure an organ or that you're going to cause a broken bone. This just happened to result, and the fact that it did result doesn't necessarily make it deadly force. Further, we also know that from the Whitley case and all that when we look at the different factors to be assessed, the severity of the injury occurred is only one of several factors. One of the factors is the need to restore the security and the discipline to the section at time. In this case, as has been pointed out, as the video clearly shows, they're faced with two additional inmates who are out in one who is getting close. So what they did, again, we look at it at their moment, they came in, they were faced with this situation, they took control, they took her down to the floor, they got control of her. Again, we all agree. No one disagrees. It was unfortunate that she suffered those sorts of injuries, but those injuries in and of themselves, just because they happen, don't make it deadly force because that was not the intent. That was not the likelihood of if we take her down, she's going to have broken bones. There is no serious likelihood of that. I would point out also the plaintiff has produced no expert testimony that would say that this technique and what they did was improper given their training. They have to get control of the situation and that's what they did. The video is very clear on what happened, on how it was happening, what they were faced with. Based on that video, we believe that it is clear that the objective reasonableness, which is the test, that those actions were reasonable at that time and that the granting of the motion for summary judgment should be affirmed. Could you address the issue raised by the jurisdictional question? Yes, I can. Judge King, I sort of looked at that myself at one point, but the way I read it. Why did you move to dismiss the appeal? Well, because the way I read the original order granting the motion for summary judgment, Judge Chambers addressed the 1983 and the reasonableness and went through all the generally in his order about the qualified immunity. Now, I may be right or may be wrong, but when I read that, I took that as him then granting these two individuals qualified immunity on the remainder of the count because there had been no constitutional violation. Therefore, they would be entitled to qualified immunity on these negligence counts. You think qualified immunity took out all the state claims? Do you? Yes, Judge King. That was my impression. And then there were also some state claims against the division of, well. Qualified immunity doesn't take out all the state claims. They're still in this case. That would be true, yes. That would be true. In that case, if the jurisdiction calls, it's not a final order. That would be true, yes. And again, and maybe I was incorrect, Judge. And when I read it, the order granting the summary judgment, I read that qualified immunity section, which was the second part of that order, as dealing with the state claims as related to these individuals. Now, maybe I was wrong in reading it that way, but that was the way that I read it. The remaining state claims against Ferguson and against the Regional Jail and Correctional Facility Authority, those were subsequently dismissed voluntarily by Mr. Murray. On that point, I mean, you would acknowledge, and we're talking about qualified immunity. We're really, in this case, talking about the overlap in the state standard is coextensive with the federal standard. But you would have to look at the state qualified immunity and analyze that in addressing the state claims. And as I read this one paragraph, I can't tell if this is an alternative holding on the 1983 claim, the Kingsley claim, even if it was a violation, they'd be entitled to qualified immunity under the federal standard. Or if it's what you're arguing, that under West Virginia, that doctrine, which is very similar, that takes care of the state claims. He doesn't specifically mention the state claims at all or specify which doctrine he's talking about. I agree, Judge Cone, that that is true. But the interaction between the federal qualified immunity standards and our state qualified immunity standards are virtually the same. And in fact, our Supreme Court has said, we look to the federal law on qualified immunity to determine how it works. And again... But that might not dispose of all the state law claims, right? I mean, it just depends on what the claim is, what the elements are. Qualified immunity may be available, it may not. I guess it just leaves us guessing as to exactly what he meant and how it applied. And I would agree with that at this point. Again, my interpretation was that he got rid of all the claims against these officers based on the qualified immunity. But maybe I read it wrong. That was my interpretation of it at the time. Your position is that we have jurisdiction? My position is that you have jurisdiction that the state law claims were disposed of and that the final order that was entered by Judge King on October the 16th took care of it. All right. Thank you, Mr. Murray. Mr. Nessel? Now, Mr. Murray's right. They have to make a split decision. Every officer does because of the circumstances, be it a correctional or a police officer. But I'm going to go back to what I've stated earlier regarding the respondent indicate. Now, I said if an inmate... This is on page 12 of my opening brief. If an inmate is against the law, wouldn't the proper use of force be that one third, the third one, C3, empty hand control that he defined against the law? And I said that would be restraining an inmate. And he said, yes. He agreed that that was the proper remedy they should have done. That goes back to what Judge Collin had asked of me. Now, that takes care of that issue. Now, another thing has been made about what deadly force is. I don't define, I did not draft the jail authority's definitions of what is what. However, in statement document number 9031, it defines deadly force as, quote, force which will likely cause death or serious bodily injury. It defines serious bodily injury as, quote, injury which creates a serious likelihood of death or major disfigurement to include broken bones, loss of limb, paralysis, or the impairment of the function of any bodily member organ. That is what happened here. We can play semantics all we want, as I stated in my reply brief. But according to what the jail authority had written, these are their lawyers. They have a team of them. They stated that what happened to Ms. McCoy was, in fact, deadly force, which would be that E5 category. So that's where we stand on that. Now, I understand, again, what we're discussing here is what they could have done. Again, Indicott and Hale agreed they could have just put their hands behind their back, as I showed, and I know Judge King can't see me because he doesn't have the video, but as their hands were behind. Well, for Judge King's purposes, you've got your hands behind your back. Yes, sir. And all they had to do, her hands are up here, and I did that. If you look at my opening brief, it says counsel's indicating, because I had left against the wall, put one back, the left, put the other back, because there's two officers. Again, this is a slight woman. These individuals, as I stated in my beginning argument, these guys were, they weren't small. Six, Indicott, six feet tall, 210 in lift weights. Hale, six feet one, 240 pounds, and he also works out. This is not much saying Ms. McCoy was a slight woman. She's about 165 pounds, but you have two big, burly individuals who testified, judges, justices. They testified that, yes, they could have used a different form of restraint. They did not. Ergo, that's excessive force. Okay. Is that it? Let me just make sure, Your Honor. And by the way, Respondent Hale, he actually apologized to my client. That denotes an admission of not guilt, because this is not a criminal matter, but of some liability. He disputes that. My client disputed that as well. They could have done a lot of things. However, they didn't. Now, I believe that my brief and the evidence here speaks for itself, and I believe the argument clearing things up. And I agree with Mr. Murray that, yes, this court does have jurisdiction. So if there's no further questions, I truly appreciate your time. Thank you. Thank you, Mr. Nessel. Thank you both for your arguments. Our practice, as I don't know if you heard earlier, is to come down, you both know, is to shake hands. It's one of those practices that's iconic to our circuit. No other court does that that I'm aware of, and we enjoy doing that. And we thank you for your arguments and greet you and hope you have a good day and whatever. And so the best we can do is what we're doing right now. And thank you. And we'll see you back in court, we hope, soon. I hope so, too. Justices, have a great weekend. Bill, nice seeing you. You too, Kerry. We'll see you. Thank you, judges. Take care. Thank you. Take care. Yes, sir.
judges: Paul V. Niemeyer, Robert B. King, Thomas T. Cullen